In the matter of the Arbitration of a Dispute Between

PIGGLY WIGGLY MIDWEST

And

UNITED FOOD AND COMMERCIAL WORKERS

LOCAL 1473

FMCS CASE NO. 100923-60170-8

Appearences:

**Mr. Robert J. Simadl**, Simandl & Prentice, S.C., Suite 250, 20975 Swenson Drive, Waukesha, Wisconsin 53186, appearing on behalf of Piggly Wiggly Midwest.

**Mr. Jonathan R. Eiden**, Sweet and Associates, LLC, 2510 East Capitol Drive, Milwaukee, Wisconsin 53211, appearing on behalf of the United Food and Commercial Workers, Local 1473.

## ARBITRATION AWARD

Piggly Wiggly Midwest, hereinafter referred to as the Company, and United Food and Commercial Workers, Local 1473, hereinafter referred to as the Union, are parties to a collective bargaining agreement that provides for final and binding arbitration of grievances. Pursuant to the parties' collective bargaining agreement the parties selected Edmond J. Bielarczyk, Jr, from a Federal Mediation and Conciliation Services panel of Ad Hoc Arbitrators to arbitrate a dispute over the wages of an employee. Hearing on the matter was held in Kenosha, Wisconsin on February 17, 2011. A stenographic transcript of the proceedings was prepared, post-hearing written arguments and reply briefs were received by the Arbitrator by April 13, 2011. Full consideration has been given to the evidence, testimony and arguments presented in rendering this Award.

## ISSUES

During the course of the hearing the parties agreed upon the folloowing issues:

1

"Is the Grievance properly before the Arbitrator?"

"Was the Grievance timely filed?"

If yes, "Does the grievance cover the appropriate wage rate?"

If yes, "What is the Grievant's correct rate of pay? If incorrect make the Grievant whole."

## PERTINENT CONTRACTUAL PROVISIONS

. . .

ARTICLE VII – GRIEVANCE PROCEDURE

7.1. A Grievance shall mean a claim, arising from an event occurring during the term of this Agreement, by an employee, Union or the Employer that rights protected under this Agreement have been violated contray to a specific provision of this Agreement.

7.1.1 Employees and/or Employer representatives shall first try to resolve grievances informally with his/her or the Union, as applicable to the claiming party. If the grievance is not resolved in this manner, a formal (written) grievance may be filed by the employee, Union representative, and/or Employer representative.

7.1.2 A formal grievance will be considered under the grievance procedure only if the grievance is submitted in writing, signed by the complaining party, within seven (7) calendar days of the date on which the event giving rise to the grievance occurred. The grievance must specify the contract provision(s) involved and the remedy which is being requested. Additional time may be granted based on the written mutual agreement of the Employer and the Union.

Formal grievances shall be handled in the following manner:

(a) The grievance shall be submitted, for the employee and Union grievances, to the Store manager, or other person designated by the Employer, who shall endeavor to settle the same satisfactorily to both parties. Employer grievances shall be submitted to the Union.
(b) Should they, however, be unable to settle the same, then the Union, for employee/Union grievances, may request a meeting with the Store Manager, or other person designated by the Employer, to endeavor to settle the matter. Employer grievances shall be discussed with the Business Agent for the Union.
(c) Any matter not resolved under (b) shall be submitted to mediation before the Federal Mediation and Conciliation Service for dispute resolution, on a nonbinding basis.
(d) Should the parties be unable to settle the same, the matter shall be submitted, in writing, within fifteen (15) calendar days after its initial presentation as outlined in

2

(a) above, with specific reference to the Article and Section of the Agreement involved, to an Arbitrator.

(i) Either the Union or the Employer shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) qualified arbitrators. The Arbitrator shall be selected by representatives of the Employer and the Union, each alternately striking a name until one remains as the selected arbitrator.

(ii) The fee and expenses of the arbitration are to be borne equally between the Employe and the Union. The arbitrator shall have the authority and jurisdiction to interpret and apply this Agreement to the grievance in question, but he shall not have the power to add to, subtract from, or modify in any way the terms of the Agreement. Each party will bear the cost of their own expenses associated with the grievance or arbitration.

(e) No grievance will be discussed or considered in arbitration unless the above procedure has been followed. This subsection (e) is not intended to preclude the introduction of evidence of past practice, unless otherwise barred by this Agreement, and relates only to the timely resolution fo the current disputed grievance.

(f) The Arbitration shall occur, unless delayed by action of the arbitrator, within ninety (90) calendar days of the date of request for arbitration. If the arbitration does not timely occur due to delay by the Union/employee, the decision of Employer under (b) above shall be final and binding on the parties. If the arbitration does not occur within the time frame due to delay by the Employer, the grievance shall be granted in favor of the employee/Union.

. . .

## ARTICLE XIX – PRIOR AGREEMENTS

This Agreement shall, except as otherwise expressly provided, supercede any prior understanding made between the parties, written and unwritten, with respect to employees employment practices/procedures covered by this Agreement. **(Referred to by the parties as the Zipper Clause.)**

. . .

## WAGES SCHEDULE

...

For employees having a rate of pay (not including premiums) in excess of the scheduled rates above on ratification, the employee will continue to be paid at the higher rate over the term of this Agreement.

3

Case 2:11-cv-00604-LA   Filed 06/22/11   Page 3 of 25   Document 1-2

Red Circle Full-time – if there has been no increase in the wage rate for an employee for one year or more and if the employee is not receiving an increase with this schedule, such employee will receive a $500 bonus (gross), payable on the first full pay period beginning after ratification. In the second year of the contract, red circled full-time employees shall receive a $500 bonus (gross), payable on the first full pay period beginning after June 6, 2010.

## BACKGROUND

The Company operates a number of retail food operations in Wisconsin including Store No. 43 located in Racine. In Store No. 43, the Company operates a bakery/deli wherein it employs Ms. Patrice Swenson, hereinafter referred to as the Grievant. The Grievant first commenced employment with the Company on June 1, 2005 at the "probationary though nine (9) months" wage rate of $6.20 per hour in the Clerk classification. At that time the parties' wage schedule was as follows:

| Regular Clerks | Current Rate | 9/3/2006 |
|---|---|---|
| 1. Probation | $5.75 | $6.00 |
| 2. Prob. - 9 Months | $6.20 | $6.40 |
| 3. 9 - 21 Months | $6.30 | $6.45 |
| 4. 21 - 33 Months | $6.65 | $6.80 |
| 5. 33 – 42 Months | $7.20 | $7.35 |
| 6. 42 – 51 Months | $7.65 | $7.85 |
| 7. 51 – 60 Months | $8.10 | $8.30 |
| 8. 60 – 69 Months | $8.90 | $9.10 |
| 9. 69 – 78 Months | $10.00 | $10.25 |
| 10. Over 78 Months | $10.80 | $11.05 |

4

| Bakery-Deli | Current Rate | 9/3/2006 |
|---|---|---|
| 1. Probation | $5.75 | $6.00 |
| 2. Prob. - 9 Months | $6.20 | $6.40 |
| 3. 9 - 21 Months | $6.30 | $6.45 |
| 4. 21 - 33 Months | $6.40 | $6.65 |
| 5. 33 – 42 Months | $6.70 | $6.95 |
| 6. 42 – 51 Months | $7.15 | $7.40 |
| 7. 51 – 60 Months | $7.85 | $8.10 |
| 8. 60 – 69 Months | $9.00 | $9.25 |
| 9. 69 – 78 Months | $9.30 | $9.55 |
| 10. Over 78 Months | $10.00 | $10.25 |

On July 17, 2005 the Company increased her to the 33-42 months rate of $7.20 per hour. The Grievant left the Company on February 4, 2006 and returned on April 10, 2006 at the $7.20 per hour rate of pay. On June 25, 2006 (six weeks later) the Company increased the Grievant to the 33-42 months rate of $7.65. On September 30, 2006 (three months later) the Company increased the Grievant to the 42-51 months rate of $7.65. On March 27, 2007 (six and one half months later) the Company increased the Grievant to the 51-60 months rate of $8.30 per hour.

On April 8, 2007 the Grievant transferred to the bakery/deli at the 51-60 months wage level but kept her rate of $8.30 per hour rather than the bakery/deli rate of $8.10 per hour. On January 15, 2008 the Company increased the Grievant to 60-69 months rate of $9.25 per hour. Nine months later, on October 15, 2008, the Company increased the Grievant to the 69-78 months rate of $9.55 per hour. Since October 15, 2008 the Grievant has not received another rate increase.

On April 15, 2009 the parties enacted a successor collective bargaining agreement. The wage rate distiction between bakery/deli clerks and regular and the following wage scale was enacted:

5

| (1) Clerks, Stockers and Checkers | Current Rate | 6/6/10 |
|---|---|---|
| 1. 0-3 months | Open | Open |
| 2. Over 3 Months - 9 Months | $7.40 | $7.50 |
| 3. Over 9 Months - 18 Months | $7.50 | $7.60 |
| 4. Over 18 Months - 30 Months | $7.60 | $7.70 |
| 5. Over 30 Months – 42 Months | $7.80 | $7.90 |
| 6. Over 42 Months – 51 Months | $8.40 | $8.50 |
| 7. Over 51 Months – 64 Months | $9.00 | $9.10 |
| 8. Over 64 Months – 70 Months | $9.70 | $9.80 |
| 9. Over 70 Months – 78 Months | $10.25 | $10.25 |
| 10. Over 78 Months | $11.05 | $11.05 |

At the time of ratification, the Grievant had been with the Company 60 months since the date of her rehire and was in the 69 – 78 months wage scale ($9.55). The Company placed the Grievant in the Over 51 months – 64 months wage scale and had scheduled her to receive an increase to the Over 64 months – 70 months wage of $9.80 on August 10, 2011 when the Grievant has been with the Company for 64 months since the date of her rehire. On June 16, 2010 bonus checks of $500.00 were sent to red-circled employees.

The instant matter arouse when Union Recording Sectretary Dale Seianas and Union Representative Mark Culotta met with Company Operations Manager Mary Zenisek on August 10, 2010 to discuss outstanding grievances. During this meeting Seianas informed Zenisek: "I don't know if I even sent you anything, but I have this outstanding – I have this question about Patrice Swenson's bonus check." (Tr. p. 20) Zenisek informed Seianas she needed something in writing and quired the Company's payroll department about the matter.

On September 2, 2010 the parties met with a mediator from the Federal Mediation and Concilation Service and the instant matter was discussed. Thereafter, on September 23, 2010 the Union submitted the following letter to the Company:

6

"DEAR MS. ZENISEK:

WE ARE GRIEVING THE COMPANY'S FAILURE TO PAY PATRICE SWENSON, A CLERK AT YOUR #43 STORE IN RACINE, WISCONSIN, HER $500.00 BONUS ON JUNE 6, 2010 AS CALLED FOR IN *OUR CURRENT LABOR AGREEMENT, "WAGE SCHEDULE" (RED CIRCLE FULL-TIME)*.

BEING UNABLE TO RESOLVE THIS MATTER AT OUR THURSDAY, SEPEMBER 2, 2010 MEDIATION HEARING, WE REQUEST THIS MATTER TO PROCEED TO ARBITRATION AS CALLED FOR IN *ARTICLE VII – GRIEVANCE PROCEDURE*."

(Jt. Ex. 2)

Thereafter, the matter was processed to arbitration. At the hearing the Company raised, for the first time, the question of whether the matter was timely.

## COMPANY'S POSITION

The Company contends that the plain language of the Grievance Procedure requires that a grievance must be submitted in writing and signed by the complaining party within seven (7) calendar days of the date on which the event occurred and that no grievance will be arbitrable if the procedure is not followed. The Company argues that without explicit action by the Union and the Company, the matter is barred from further proceeding. The Company avers the grievance must be denied pursuant to Article VII, Section 7.1.2 of the collective bargaining agreement because the Union failed to file a written grievance until nearly four (4) months after the event giving rise to the grievance occurred. The Company asserts the Union's failure to submit a timely grievance on behalf of the Grievant's claim to a Red Circle bonus is insurmountable. The Company points out the Union raised the issue for the first time during the August 9, 2010 meeting with Zenisek, over two (2) months after the date on which the event giving rise to the grievance occurred. The Company contends it is significant that no written grievance was ever received by the Company regarding the bonus payment until September 23, 2010.

7

The Company also contends the Union cannot rely on past practice to circumvent its disregard of the grievance and arbitration provisions of the agreement. The Company acknowledges the Union claimed at the hearing that the Company waived its right to object to the arbitrability of the grievance because past practice was to resolve grievances with a verbal discussion. The Company further acknowledges that clerical errors have been informally raised by the Union in the past and have been immediately addressed by the Company. The Company also acknowledges that Section 7.1.1 contemplates the parties may attempt to resolve grievances informally prior to submitting a written grievance. However, the Company argues the mere fact the Union may from time to time contact Zenisek to informally resolve matters does not waive the seven (7) day requirement.

The Company argues that as recently as March 2010 the Company raised the issue of procedural arbitrability stemming from the Union's failure to timely file a grievance pursuant to Section 7.1.2 of the instant agreement in FMCS Case No. 090923-61195-8. (Employer Ex. 1) Therein the arbitrator held that because the processing of grievance did not comply with the collective bargaining agreement's time requirements, an arbirtation hearing on the merits would be untimely and the arbitrator denied and dismissed the grievance. The Company concludes the Union simply cannot support its claim that the parties' past practice waives the Company's right to object to the grievance as untimely because the Union cannot demonstrate any evidence to support such a practice.

The Company also contends Article XIX of the collective bargaining agreement, the zipper clause, addresses past practices by stating that prior written or unwritten policies and procedures are superseded by the terms of the current collective bargaining agreement. The Company contends the zipper clause bars the use of past practice by the Union in an attempt to excuse its failure to file a timely grievance. The Company argues any past practice the Union now attempts to conjure regarding the Company's non-stringent approach to the grievance procedure cannot be considered. The Company further argues that when past practice conflicts with unambiguous language, the language prevails over the practice.

8

The Company acknowledges the duty to arbitrate is of contractual origin, but argues compulsory submission to arbitration cannot precede judicial determination that the collective bargaining does in fact create such a duty. The Company argues the grievance provision clearly states no grievance will be discussed or considered in arbitration unless the step-by-step procedure contained in Section 7.1.2 of the agreement is followed; that the Company cannot be forced to arbitrate issues it has not agreed to arbitrate and it cannot be forced to arbitrate if the arbitration clause does not bind it. The Company contends the position advocated by the Union is contrary to the plain language of the collective bargaining agreement and would render the procedure set forth in Section 7.1.2 meaningless. The Company argues each word and phrase of the collective bargaining is to be given meaning and therefore the Arbitrator is without jurisdiction to arbitrate the matter.

The Company also contends, *Arguendo*, if a timely grievance was filed, the Union failed to raise an issue as to the Grievant's rate of pay. The Company points out the Union, for the first time, raised the issue as to the appropriate pay rate for the Grievant. The Company points out the September 23, 2010 letter specifically identifies the purpose of the grievance, the Company's failure to pay the Grievant a $500.00 Red Circle bonus on June 6, 2010. The Company avers the Union did not raise the issue as to the Grievant's rate of pay prior to the hearing. The Company concludes the Union has failed to meet any of the requirements of the grievance procedure and therefore the matter should be barred from any further discussions.

The Company argues the Union contention that the Company's failure to pay the Grievant the June 6 bonus is related to the Company's failure to progress her to the top wage scale is disingenerous and circumvents the terms of the agreement. The Company points out the Union did not reference the Grievant's wage rate in its September 23, 2010 letter nor did it seek a remedy for the wages and a reclassification to the $10.25 rate of pay. The Company argues the Union's claim that the matter is a recurring violation and that the Grievant was paid an incorrect wage rate as of July 15, 2009, ignores the fact such a grievance had to be filed within seven (7)

9

days and the fact the Union never grieved an incorrect wage rate. The Company argues the position advocated by the Union would render the plain language of Article VII meaningless. The Company points out the major purpose of a multi-step grievance procedure is to promote dialogue and to allow additional thought and information to be brought to bear on the problem. The Company concludes that because the Union failed to file a grievance over the Grievant's rate of pay, the grievance should be dismissed.

The Company also contends that under the clear and unambiguous language of the collective bargaining agreement the Grievant was not a Red Circle employee and was not entitled to the June 6 bonus payment. The Company argues the language of the collective bargaining agreement is clear and unambiguous as to how employees with a rate of pay in excess of the scheduled rates on ratification of the collective bargaining agreement and employees who are at the top rate and are no longer entitled to a wage increase under the Wage Scale (Red-Circle Full-time employees). The Company asserts its interpretation of the Red Circle provision coinsides with the letter of the collective bargaining agreement. The Company asserts the Union argument that the Grievant was entitled to a bonus is that in the second year of the agreement she would not have received a wage increase and is therefore characterized as a Red Circle employee. The Company argues this claim is unsupported by the language of the collective bargaining agreement and entirely ignores the provision regarding employees who have a rate of pay in excess of the scheduled rates.

The Company contends that during contract negotiations the Company bargained into the collective bargaining agreement for employees who were hired into a higher rate, that they would be held at that level until they met the months of service to the scale. Thus, if an employee was hired into the 42 months of service rate, the employee would be held at the 42 months rate until the employee got to 42 months of service. The Union acknowledged the matter was only discussed, and only discussed in regards to the facilities in Sheboygan, Menasha and Oshkosh. Further the Union claim that this was only to apply to assistant managers is not

10

supported by any evidence. The Company concludes the clear and unambiguous provisions of the collective bargaining prevail.

The Company avers that when the provisions of the collective bargaining agreement are analyzed without any evidence of the discussions during negotiations, an arbitrator should interpret the revisions objectively in accord with the ordinary meaning of words. The Company contends the only reasonable conclusion that can be drawn from the addition of the Red Circle language and the separate language regarding employees with a rate of pay in excess of the scheduled rates, is that the Company, specifically in regard to 'over paid' employees, reserved the right to freeze the employee at the higher rate throughout the term of the collective bargaining agreement.

The Company points out that as of January 1, 2011 the Grievant was paid $9.55 per hour and that based upon her hire date of April 10, 2010, her rate of pay would be $9.10 per hour. The Company stresses this is a twenty-four (24) months rate increase over her actual years of service. The Company contends there is no provision in the collective bargaining agreement that once it has progressed an employee beyond their normal rate of progression, they must maintain the enhanced wage rate. The Company argues the Company has, at its discretion in certain cases, progressed an employee beyond their normal rate under the wage schedule. The Company argues it chose to eradicate this practice, or at least assure it was not bound to such a practice, with the 2009 collective bargaining agreement. The Company asserts the excess of scheduled rates provision allows the Company, at the Company's discretion, to continue the practice, if at all. The Company argues the Union cannot deny the plain language of the agreement nor deny the inclusion of the zipper clause. The Company argues the only reasonable conclusion is that the inclusion of the scheduled rates provision and the zipper clause is that the Company reserved the discretion to freeze employees such as the Grievant who were paid at a higher rate than their scheduled rate and that the Company did not wish to be bound to any alleged past practice in regards to wage administration.

11

## UNION'S POSITION

The Union contends the Company has not submitted sufficient evidence that the Company's timeliness defense overcomes the presumption of arbitrability. The Union argues the Company waived any timeliness argument under the collective bargaining agreement by failing to raise the issue before the day of the hearing. The Union argues when an arbitrator is confronted with an objection on timeliness that is first raised on the day of the hearing, the arbitrator must find that the grievance remains arbitrable. In effect, the Union contends that the failure of the Company to raise the timeliness question prior to the day of the hearing, the Company relinquished its right to raise this defense.

The Union points out when the issue concerning the Grievant's bonus check was raised to Zenisek at the August 9, 2010 meeting, Zenisek was aware the bonus checks were issued on June 6, 2010, was aware a formal grievance must be filed within seven (7) days of the incident giving rise to the grievance and was aware that if the Union fails to provide a written grievance the Company is not supposed to move forward and the grievance is suppose to drop. (Tr. pp. 18-20) Zenisek did not inform the Union that the matter was untimely but she did contact the payroll department that same day to inquire about the issue and told the Union she would need something in writing. (Tr. p. 20) The Union concludes Zenisek clearly did not think the matter was untimely on August 9, 2010.

The Union points out that at the next step in the grievance process, mediation on September 2, 2010, the matter was discussed and, at that time, the Company did not raise any timeliness questions. The Union also points out that over the next several months, the Company and the Company's counsel participated in the selection of an arbitrator, production of documents and weeks of scheduling correspondence. At no point during this process did the Company raise the issue of timeliness with the Union. The Union argues the Company, by its actions, constructively waived the time limits on the processing of the grievance.

12

The Union argues the Company waived its timeliness argument by acting inconsistently with a previous grievance in which timeliness was an issue. The Union points to Employer Exhibit one and avers therein the Company raised the timeliness issue to the Union in a written letter and informed the arbitrator immediately that there was a procedural question and requested a hearing on the procedural question prior to a hearing on the merits. The Union concludes the Company is clearly aware of potential timeliness defences as well as the practice of putting the Union on notice of a timeliness issue as soon as it is identified. The Union was not accorded the opportunity to evaluate its position and to determine whether to incur the expense and burden of processing the grievance to arbitration.

The Union also argues the Company did not notify the Union that it planned to strictly enforce the timelines of the grievance procedure. The Union points out that when the parties met on August 9, 2010, it was to discuss sixteen unresolved grievances as well as the instant matter. The Union argures that as of that date, neither of the parties considered the unresolved grievances as untimely. The Union concludes, given the prior leniency afforded the parties and the fact that the Company did not raise the issue of timeliness until the day of the hearing, the Company has failed to overcome the presumption of arbitrability to prevent consideration of the merits.

The Union also contends the Grievant's appropriate wage rate must be established in order to determine whether she was entitled to a bonus check in the second year of the collective bargaining agreement. The Union argues the Grievant should have received a wage increase on July 15, 2009 which would have put her at the top of the wage schedule and made her eligible for the $500.00 bonus check in the second year of the collective bargaining agreement. The Union points out the Company denied the bonus to the Grievant because she was still in wage progression and this was the primary reason the Company denied her the bonus.

13

The Union argues the collective bargaining agreement allows the Company to grant up to three years of experience and allows the Company to accelarate an employee's wages. However, the Union avers that how an employee progresses once their rate of pay is inconsistent with their years of service is not covered by express language in the collective bargaining agreement. The Union contends the parties practice is to progress the employee in accord with the progression of their granted years of service, not their actual years of service.

The Union points out the Company did not present any evidence to dispute this past practice and argues the Company relies solely on the zipper clause for ending the way the pay schedule is administered. The Union also points out that during negotiations, the Union rejected the Company's attempt to alter the way the wage schedule is administered. (Tr. p. 65-66) The Union further argues the collective bargaining agreement does not unambiguously address how the wage schedule is to be administered when an employee is being paid ahead of schedule. The Union further argues a zipper clause does not eliminate a practice that helps the parties understand the meaning of ambiguous language. The Union further argues that one party cannot unilaterally change the interpretation of ambiguous language when that ambiguity has been resolved by past practice.

The Union contends the Grievant should have received her final wage increase on July 15, 2009 and therefore eligible for the $500.00 bonus in the second year of the collective bargaining agreement. Once the Grievant advanced to the top rate, the Grievant became "Red Circle Full-time." The Union argues the 'Red Circle Full-time" provision requirement that an employee has not received a wage increase for one full year is limited to the first year of the collective bargaining agreement. The Union points out the "one year wage increase limitation" is not a requirement for a bonus in the second year of the collective bargaining agreement.

The Union also contends the industry definition of a "red circled" means an employee who recieves an hourly rate greater than the rate of a new position to which the employee is assigned

14

or receives a rate that exceeds the top rate of the position. The Union concludes that the Grievant should have received her final wage increase on July 15, 2009 and therefore she is eligible for the bonus of $500.00 on June 6, 2010.

## COMPANY'S REPLY BRIEF

The Company asserts the Union cannot circumvent the fact that the grievance was untimely. The Company argues the agreement clearly sets forth a detailed step-by-step grievance procedure providing for strict timelines for filing and processing a grievance. The Company argues the Union had seven (7) days from the "date on which the event giving rise to the grievance occurred" to file a formal written grievance. The Company points out Zenisek reminded the Union the Union needed something in writing on August 9, 2010. (Tr. p. 18) The Company also points out the Union did not seek an extension for filing the grievance. The Company contends the timelines in the Agreement are not ambigous, the Union must comply with the unambiguous language. The Company stresses the collective bargaining clearly sets forth time limits and the Union failed to meet a single requirement of the grievance procedure.

The Company also contends the Union failed to establish a past practice of the Company's laid back approach to procedural timelines. The Company further contends FMCS Case No. 090923-61195-8 established the requirement that timelines be complied with. The Company points out that matter occurred during the term of the present collective bargaining agreement and demonstrates the Company's determination to adhere to the detailed grievance procedure it had bargained. The Company also argues that when the parties changed the language of the grievance procedure and added the zipper clause, the unambiguous language of the grievance procedure contains everything the Arbitrator needs to render a decision regarding the Union's failure to submit a timely grievance. The Company further argues to establish a past practice the Union needed to demonstrate more than mere generalities or a single incident to conclude the

15

parties had established a mutual understanding of the way the greivance procedure was to be followed.

The Company also argues it is not required to notify the Union of its defence prior to hearing. The Company contends the FMCS Case No. 090923-61195-8 matter placed the Union on sufficient notice the Company would operate the grievance procedure in accord with the strict terms of the collective bargaining agreement. The Company avers it should not be required to "warn" the Union with every single defense it may raise at Hearing, especially when the collective bargaining agreement does not require it to do so. While the Union may conclude such an action is unfair, the Company points out the Union was notified on August 9, 2010 by Zenisek that she had not received a written grievance. The Company concludes Zenisek's statement alerted the Union to the Company's refusal to arbitrate an untimely grievance.

The Company also contains the Union's failure to have Sieanas and Culotta at the hearing is of no consequence to the fact the Union failed to file a timely grievance. The Company also asserts the fact that Zenisek contacted the payroll department on August 9, 2010 when the Grievant's bonus payment was discussed or the fact the parties submitted the matter to mediation on September 2, 2010 is insufficient to conclude the Company waived their right to assert a timeliness defense, as the parties have an option to resolve the matter voluntarily.

The Company also avers the Union never grieved the Grievant's wage rate and therefore the matter is not arbitrable. The Company points out the only remedy sought by the Union was the bonus payment.

The Company further contends the Union fails to establish that the Grievant is entitled to a Red Circle bonus. The Company argues the collective bargaining agreement provides distinct treatment for employees with a rate of pay in excess of the scheduled rates. The Company

16

argues that the Grievant received an increase on October 15, 2008, and, as this was within one year of the date of ratification (April 15, 2009), the Grievant was not eligible for the a bonus in the first year of the collective bargaining agreement. Further, as the Grievant will receive an increase on August 10, 2011 consistent with the wage schedule, the Grievant did not fall within the parameters of a "red-circled" employee. The Company contends this language is unambiguous. The Company points out the Union argued a "red-circled" employee is an employee who is at the top of a wage schedule and, clearly, the Grievant was not at the top of the schedule. The Company contends the Union argument that the "red-circled" provision was implemented to ensure every employee would get something during the contract, if they didn't get a raise increase they would received a bonus, fails because the Grievant will receive a wage increase within each year of the agreement.

The Company also argues that under the unambiguous terms of the collective bargaining agreement and past practice the Grievant was not entitled to a wage increase on July 15, 2009. The Company points out the collective bargining agreement expressly provides that employees "who have a rate of pay (not including premiums) in excess of the scheduled rates on ratification **continue to be paid at the higher rate over the term of the Agreement**. (Emphasis added, Jt. Ex. 1 at Appendix 1, p.2) The Company asserts it is significant the collective bargaining agreement does not contain any express language that once the Company progresses an employee beyond their normal rate they must maintain the enhanced rate. The Company also argues the fact it has at its discretion advanced an employee more quickly than was required by the schedule does not establish an implied practice that requires the Company to continue to advance the employee. The Company argues the Union has attempted to mischaracterize the Company's alleged past practice despite the fact that prior acts cannot be used to change the meaning of explicit terms of the collective bargaining agreement. The Company asserts it is obvious the Company intended to change the way it administered the wage schedule under the previous agreement with the addition of a clause specifically related to employees paid in excess of their scheduled rates. The Conpany avers it chose to stop advancing employees at a rate higher than their scheduled rate during the term of the current agreement. The Company argues

17

the Union cannot deny the plain language of the agreement, nor can it overcome the inclusion of the zipper clause.

The Company would have the Arbitrator deny the grievance as untimely. The Company would have the Arbitrator deny that the grievance covers the appropriate wage rate of the Grievent. The Company would have the Arbitrator deny the grievance on the merits.

## UNION'S REPLY BRIEF

The Union contends the Company's sudden insistence on following the plain language of the grievance procedure is inconsistent with the Company's processing the intstant matter. The Union argues the Company claims a grievance should not move forward if the Union fails to follow to the letter of the formal grievance procedure, that if there is no written grievance the matter should be dropped and not proceed to arbitration. The Union points out the matter was not dropped and did proceed to arbitration. The Union concludes the Company did not follow the "formal" procedure and the Company's actions of processing the grievance supports the Union's position concerning the Company's laid-back approach to the grievance and arbitration provision. The Union concludes the Company constructively waived its right to raise the issue of timeliness by not acting in accordance with the plain language of the grievance procedure.

The Union also asserts the parties did not negotiate a change in the way the wage scheduled would be administered and asserts no new contract language suggests otherwise. The Union argues the Company presented no evidence that would suggest the parties agreed to alter the practice on how the wage scheduled was administered. The only testimony on this issue is from Grant Withers and his uncontradicted testmony was that the intent of the language regarding employees who have wages in excess of the the schedule was limited to new employees deemed "assistant managers". (Tr. pp. 77-78) The Union also argues the plain language of this provision

18

supports a conclusion of maintaining the practice of consistently progressing employees ahead of schedule. The Union concludes the bargaining history undermines the Company's position that it had achieved the discretion to freeze employees wages such as the Grievant.

The Union further contends the Grievant was a Red Circle employee under the collective bargaining agreement in the second year of the collective bargaining agreement. The Union avers it is essential to determine the Grievant's correct pay to determine whether the Grievant should receive a bonus. The Union points out that if the Arbitrator accepts the Company's definition of a Red Circled employee, (an employee who has reached the top of the schedule, or who did not receive a raise within one year of the collective bargaining agreement, or who will not receive a raise under the collective bargaining agreement) the Grievant is entitled to the June 6, 2010 bonus because her last wage increase was on October 28, 2008 and she will not receive an increase until August 10, 2011. Therefore, the Grievant is a Red Circled employee because she will not receive an increase during the term of the collective bargaining agreement. The Union notes the Company set forth more than one definition of Red Circle in its brief, however, the Union contends its definition of Red Circle does not change the decades old practice between the parties for administering the wage scale.

The Union would have the Arbitrator sustain the grievance and order an appropriate make whole remedy.

## DISCUSSION

The burden is on the Company to demonstrate the Union did not file the instant matter in a accord with the grievance procedure and that the instant matter is therefore procedurally defective. At the onset, the Undersigned finds the Company's reliance on FMCS Case No. 09023-61195-8 to be unpursuasive. Therein, the arbitrator dealt with the Union's failure to move the matter to arbitration in a timely manner. Therein, there was no dispute the Company immediately raised the procedural question of whether the matter was timely. Therein, the Company informed the arbitrator at the time of the arbitrator's selection of the procedural

19

problem, including a request by the Company to have a hearing on the procedural question prior to a hearing on the merits. Thus, in that matter the Company immediately informed the Union of the Company's procedural concerns and the Company also immediately informed the arbitrator of the Company's procedural issue. Herein, the Company did not inform the Union or the Undersigned of the procedural issue until the day of the hearing. Therefore the Undersigned finds the two matters distinguishable.

The Undersigned would agree with the Company's assertion that the decision in that matter placed the Union on notice of the Company's intent to strictly enforce all of the grievance procedure's timelines, however, the Company's actions do support such a conclusion. The Company did not the inform the Union at the August 9, 2010 meeting that it was strictly enforcing the grievance procedure's timelines. Here the Undersigned finds Zenisek's statement at that meeting that she needed something in writing on the instant matter as a statement concerning a matter of minor technicality, not a notice the Company would not consider the matter because it was untimely or procedurally defective. Nor did the Company inform the Union prior to or at the mediation session on September 2, 2010 that there was a procedural problem with the instant matter. At that session the Company could have refused to discuss the matter because it was untimely and/or because the Union had failed to submit a written grievance. The record demonstrates the Company did neither and the parties discussed the matter. The record also demonstrates that when the Company received the September 23, 2010 notice to proceed to arbitration it could have, as in the other matter, informed the Union of the procedural problem. The record demonstrates the Company did not do so. Given the above the Undersigned finds the other matter did not place the Union on notice the Company was going to strictly enforce all of the provisions of the grievance procedure.

As noted above, the burden is on the Company to demonstrate the instant matter was procedurally defective. The Company's assertion that the language of the grievance procedure is clear and unambiguous is also unpersausive. In its brief, the Company argued the parties "may" have informal discussions in an attempt to resolve the matter. The Undersigned disagrees.

20

Article VII, Section 7.1.1, specifically states the parties "shall" try to informally resolve disputes. The use of the term "shall" does not allow for such a discussion to be permissive, but mandatory. The placement of this provision at the beginning of the Article VII prior to any of the steps of the grievance procedure leads to a conclusion that the parties are committed to an effort to voluntarily resolve disputes and only after such an effort is a grievance to be filed. The problem this creates is there is no time frame identified for when the informal effort is to occur. One conclusion could be it is concurrent with the formal process. However, Section 7.1.1 concludes with the statement that if the matter is not resolved informally a "... formal (written) written grievance ..." may be filed. This creates a conflict with Section 7.1.2, wherein a formal grievance must be filed within seven (7) calendar days of the event giving rise to the grievance. The Undersigned notes here that it is typical to place a caveat of "known or should have known" of the event giving rise to the grievance. The fact the Grievant did not raise the matter immediately can be for a number of reasons, such as not knowing she was being frozen at her current rate until August 2011 or not understanding what Red Circled meant. However, because the Company did not raise the timeliness issue until the day of the hearing there is nothing in the record that demonstrates the Grievant was aware on June 6, 2010 that she was or was not elligible for the bonus. The Undersigned finds the Company has failed to demonstrate that the Greivant was aware on June 6, 2010 that she believed she was improperly denied a bonus. The Undersigned also notes here the arbitrator in FMCS Case No. 09023-61195-8 had a similar problem two conflicting provisions but he was able to harmonize the two conflicting provisions. While the Undersigned would agree that the purpose of the grievance procedure is to promptly resolve disputes and that there should be some time frame as to when the process should start, it is clear that an informal meeting to resolve grievances must occur first. Further, as noted by the Company, the Undersigned does not have the authority to add to the terms of the collective bargaining agreement. Thus, the Undersigned cannot create a timeframe for having the informal meeting required by Section 7.1.1. and concludes that as the provisions cannot be harmonized the language of the grievance procedure is not clear and unambiguous.

The Company has also made the assertion that the Zipper Clause bars the use of past practice. However, how the parties have administerd language of a provision that is ambiguous is relevant,

Case 2:11-cv-00604-LA   Filed 06/22/11   Page 21 of 25   Document 1-2

particularly herein where the grievance procedure clearly allows the introduction of evidence of past practice, Section 7.1.2 (e). The record demonstrates that at the August 10, 2010 meeting the parties discussed sixteen (16) grievances in addition to the instant matter. Zenisek testified that she was getting an update on the status of these grievances. (Tr. p. 18) If, as the Company has claimed, it was strictly enforcing the provisions of the grievance procedure, Zenisek should have stated so at this meeting. Further, there should have been some evidence demonstrating the mutual written agreement of the parties to extend the timelines in some, if not all, of the sixteen (16) cases they were meeting to discuss and some evidence that all, if not some, of these sixteen (16) grievances were filed within seven (7) days of the event giving rise to the grievance. The Undersigned notes here, as the Union pointed out, Withers testimony about the laid back approach of parties to grievance processing was undisputed by the Company. While the Undersigned would agree the Company may desire to cease this laid back approach, given proper notice to the Union and a correction of the ambiguity of the grievance procedure, the Company has failed to demonstrate they did so.

After reading the cases cited by the parties concerning constructive waiver, the Undersigned finds pursausive the Union'a assertion that the Company, by its actions, waived a procedural defense. The record clearly demonstrates the Company did not raise a timeliness defense at the August 18, 2010 meeting. The record clearly demonstrates the Company did not raise any procedural defense when they mediated the matter on September 2, 2010. The record clearly demonstrates the Company did not, as it did in FMCS Case No. 09023-61195-8, raise a procedural defense when the Union requested that the matter proceed to arbitration on September 23, 2010. The Undersigned concludes that by its inactions, the Company waived the procedural defense.

Therefore, based upon the above and foregoing, and the testimony, evidence and arguments presented the Undersigned finds the grievance is timely and properly before the arbitrator.

Similarly to the reasoning above the Undersigned finds the Union's argument that the Greivant's appropriate wage rate is covered by the grievance is unpursausive. The Union did not raise this concern until the day of the hearing. The September 23, 2010 request to arbitrate clearly identifed the bonus as the issue in dispute. The matter was not raised on August 10, 2010 nor was it discussed at the mediation session on September 2, 2010. The grievance procedure clearly requires the parties to have an informal meeting to discuss such a matter prior to proceeding through the grievance procedure. Having found no time constraint on when such an informal meeting is to take place, the Undersigned directs the parties to have an informal meeting to determine if they can resolve the matter. The Undersigned stresses here that Section 7.1.1 clearly allows a formal grievance to be filed if the parties are unable to volutarily resolve the matter. While the Undersigned is sympathetic to the Union's concerns about the continuing violation of the collective bargaining agreement that this matter may be, the Undersigned is also aware that such a decision may impact on other employees and is unaware of whether this may have only occurred to the Grievant. Further, as will be addressed below, the Undersigned does not need to determine the Grievant's correct pay scale to determine whether the Company violated the collective bargaining agreement when it failed to pay the June 6, 2010 bonus to the grievant.

The remaining question before the Undersigned is whether the Company violated the collective bargaining agreement when is failed to pay the Grievant the June 6, 2010 bonus. Both parties offer different interpretations of what the added provisions to the collective bargaining agreement mean. The record demonstrates that each party walked away from the bargaining table with a different view of their meaning. However, on their face, each provision has clear meaning.

> "For employees having a rate of pay (not including premiums) in excess of the
> scheduled rates above on ratification, the employee will continue to be paid at
> the higher rate over the term of this Agreement."

This provision clearly prohibits the Company from decreasing the rate of pay of an employee who is receiving a rate over the scheduled rates. Contrary to the Company's assertion, it does

23

not bar an employee from advancing in their rate of pay. The Undersigned does note here that while Article II allows the Company to grant up to three years experience, that provision is silent concerning whether the Company has the discretion to take away experience once it has been granted.

> "Red Circle Full-time – if there has been no increase in the wage rate for an employee for one year or more and if the employee is not receiving an increase with this schedule, such employee will receive a $500 bonus (gross), payable on the first full pay period beginning after ratification. In the second year of the contract, red circled full-time employees shall receive a $500 bonus (gross), payable on the first full pay period beginning after June 6, 2010."

A careful review of this provision, contrary to arguments of the parties, demonstrates this provision is not limited to employees at the top of the schedule. While that may have been what the parties intended, they did not place such a restriction in the language. In effect, any employee who is receiving a rate of pay in excess of the agreed upon wages is a "Red Circle " employee.  As noted above, when the Agreement was reached in April 2009 the Grievant was in the 69 to 70 months pay range  receiving $9.55 per hour. The parties presented no evidence on how employees were to be assigned to the new wage schedule. The Company placed the Grievant in the Over 51 months – 64 months wage scale (Step 7, $9.00), continued to pay her $9.55 and scheduled her to receive an increase to the Over 64 months – 70 months wage of $9.80 (Step 8) on August 10, 2011. Given the records silence on what method the parties agreed upon to assign employees to the new wage schedule the question arises as to whether she should have been assigned to Step 7, thus being "Red Circled" or to Step 8 receiving an increase to $9.70 and being on schedule. The Greivant had been advanced to the $9.55 rate on October 15, 2008. The Company clearly complied with the exess of scheduled rates provision when it did not reduce the Grievant's pay. However, because the Grievant is receiving a rate higher than the scheduled rate, she is a "Red Circle" employee. The Grievant is receiving a wage rate not assigned to Clerks, Stockers and Checkers. When the salary schedule increased on June 6, 2010 the Grievant did not receive an increase because she already exceeded Step 7's rate of $9.10. Thus, contrary to the Company's assertation, the Grievant is not receiving a wage increase during the entire term of the collective bargainig agreement (the agreement has a April 1, 2011 expiration date). The Undersigned notes that had the Company moved the Grievant to Step 8 of the wage scale in July 2009 she would have been on schedule and no longer a "Red Circle" employee. On

June 6, 2010 she would have received the schedule increase and would still be on schedule. However, because the Grievant is receiving wage rate not identified in the collective bargaining agreement, the Grievant is clearly a "Red Circle" employee who should have received the $500.00 bonus. Therefore, based upon the above and foregoing, and the evidence, testimony and arguments presented the Undersigned concludes the Company violated the collective bargaining agreement when it failed to pay the Grievant the $500.00 (gross) bonus on the first full pay period after June 6, 2010. The Company is directed to pay the Grievant the $500.00 (gross) bonus.

## AWARD

1. The grievance was timely filed and properly before the Arbitrator.
2. The grievance does not cover the appropriate wage rate issue and the parties are directed to meet in accord with Article VII, Section 7.1.1 attempt to resolve the matter.
3. The Company violated the collective bargaining agreement when it failed to pay the Grievant the $500.00 (gross) bonus. The Company is directed to pay the Grievant the $500.00 (gross) bonus.

Dated at Sun Prairie, Wisconsin this 29th day of April, 2011

Edmond J. Bielarczyk, Jr.
Arbitrator

EJB/mmb

Case 2:11-cv-00604-LA   Filed 06/22/11   Page 25 of 25   Document 1-2